IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JACOB R. LEAMING, and            )
THE WEST CENTRAL MISSOURI        )
REGIONAL LODGE NO. 50 OF THE     )
FRATERNAL ORDER OF POLICE,       )
                                 )
                    Plaintiffs,  )
                                 )
v.                               )        Case No. 03-00940-CV-W-SWH
                                 )
JACKSON COUNTY, MISSOURI,        )
                                 )
                    Defendant.   )

ORDER

Plaintiffs brought this action pursuant to the First and Fourteenth Amendments to the United

States Constitution and the provisions of 42 U.S.C. § 1983. Plaintiffs allege that defendant Jackson

County, Missouri, acting under color of state law, deprived plaintiffs of their rights, in that:

a.   Defendants[1] subjected Plaintiffs to persecution due to their involvement with
     the Fraternal Order of Police;

b.   Defendants terminated Plaintiff Leaming's employment in retaliation for his
     activities and involvement with the Fraternal Order of Police;

c.   Defendants acted in a retaliatory manner designed to undermine and
     eliminate Lodge 50, which has a right to exist; and

d.   Defendants' actions were in bad faith.

(Complaint at 5) Defendant Jackson County filed a Motion for Summary Judgment seeking

_____

[1]In addition to Jackson County, Missouri, plaintiffs originally sued the Jackson County
Sheriff's Department, Sheriff Thomas S. Phillips and Undersheriff Bobby J. Kreitler. The
Jackson County Sheriff's Department, Sheriff Phillips and Undersheriff Kreitler were dismissed
from this action on July 26, 2005.

summary judgment on all of plaintiffs' claims.  Plaintiffs oppose the motion.

I.  <u>STANDARDS FOR EVALUATING A MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is granted when the pleadings and evidence show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  The burden is on the moving party to show the absence of evidence to support the nonmoving party's case.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).  The nonmoving party may not rest upon allegations or general denials, but must come forward with specific facts to prove that a genuine issue for trial exists.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).  In doing so, all evidence and inferences therefrom are viewed in the light most favorable to the nonmoving party.  <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970).

II.  <u>UNDISPUTED MATERIAL FACTS</u>

The following facts are deemed uncontroverted for purposes of defendant's Motion for Summary Judgment:

**A.**      **<u>The Parties</u>**

**1.**      **<u>The Jackson County Sheriff's Department</u>**

1.      Thomas S. Phillips is the sheriff of Jackson County, Missouri, and has held that position since August 2000.  (Defendant's Statement of Uncontroverted Material Facts ("Defendant's Fact") #1)

2.      Phillips makes the final decisions regarding what kind of formal discipline, if any, to impose on Sheriff's Department personnel.  (Defendant's Fact #2)

3.      Directly beneath Phillips in the chain-of-command is the under-sheriff, Colonel Bobby J. Kreitler.  (Defendant's Fact #3)

4.      Kreitler oversees five division commanders who command the five different divisions:  patrol division, investigations division, staff services division, court security division and warrants division.  (Defendant's Fact #4)

2

5.      Each division commander holds the rank of captain, and each captain oversees one to six sergeants in the chain-of-command. The sheriff's deputies fall under the sergeants in the chain-of-command. (Defendant's Fact #5)

6.      Kreitler oversees the day-to-day operations of the whole department which include, among other things, meeting and conferring with the captains and investigating both internal and external complaints. In that role, Kreitler determines whether a complaint will be investigated by the chain-of-command or whether it will be handled as an internal affairs complaint. (Defendant's Fact #6)

7.      More serious complaints, such as violations of policy, rules, regulations or actions bordering on criminal conduct, are investigated through an internal affairs investigation. Less serious complaints are investigated and handled through the chain-of-command. (Defendant's Fact #7)

8.      Once the department has conducted an investigation, Kreitler reviews the report of investigation and makes a recommendation to Phillips about an appropriate course of action. (Defendant's Fact #8)

9.      After Sheriff Phillips reviews the investigation report and Colonel Kreitler's recommendation, he decides what course of action to take. (Defendant's Fact #9)

10.     Sheriff Phillips, Colonel Kreitler and Sergeant Tuttle all attended extensive training on proper investigative techniques, including collection of evidence and appropriate means to conduct investigative interviews. All of them during their careers have served as Internal Affairs Detectives. (Plaintiffs' Statement of Additional Facts ("Plaintiffs' Fact") #10)

11.     Sheriff Phillips, Colonel Kreitler and Sergeant Tuttle all testified that when conducting interviews of fact witnesses, the most proper means of collecting witness statements is to allow the witness to offer testimony in their own words, and not to ask leading questions. (Plaintiffs' Fact #11)

12.     Sergeant Ross Caponetto, a non-FOP member, received a three day suspension for disseminating approximately 95 e-mails containing sexually explicit jokes, photographs and/or cartoons.[2] (Plaintiffs' Fact #12)

13.     Sergeant Lane Eitel, a non-FOP member, received a five day suspension for

_____

[2]Plaintiffs allege that the e-mails were sent to other members of the Department through the Department's computer system. (See Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 35)

3

receiving and disseminating sexually explicit e-mails.[3]  (Plaintiffs' Fact #13)

## 2.    The Fraternal Order of Police

14.    The Fraternal Order of Police ("FOP") is an association of law enforcement officers (and some eligible civilians) that is organized into various lodges and chapters.  An FOP chapter is a sub-unit of a larger lodge.  (Defendant's Fact #10)

15.    The FOP is an international labor organization representing approximately 321,000 police officers and more than 2,100 local lodges worldwide.  The organization is committed to improving working conditions of all law enforcement officers through education, legislation, information dissemination and community involvement. (Plaintiffs' Fact #1)

16.    West Central Missouri Regional Lodge No. 50 of the FOP was chartered in approximately 1990 and represents law enforcement officers employed by police and sheriff's departments in Bates, Cass, Jackson, Clay, Ray and Platte Counties in Missouri, with the exception of the Kansas City and Independence, Missouri Police Departments.  (Plaintiffs' Fact #2)

17.    Membership in the FOP is restricted to law enforcement officers and civilian employees of the police or sheriff's departments.  (Plaintiffs' Fact #3)

18.    FOP is divided into several regional subchapters.  Chapter 3 of the FOP represents members of the Jackson County Sheriff's Department.  (Plaintiffs' Fact #4)

19.    FOP Chapter 3 is a sub-unit of the West Central Missouri Regional Lodge No. 50. (Defendant's Fact #11)

20.    To be a member of FOP Chapter 3, a person must be employed by the Jackson County Sheriff's Department.  (Defendant's Fact #12)

21.    Sergeant Joseph Becker, Jr. is chairman of the FOP Chapter 3.  (Defendant's Fact #13)

22.    Joseph Becker, a sergeant with the Jackson County Sheriff's Department currently serves as the FOP "Guard" and as the chairman of Chapter 3.  Sergeant Becker has been employed by the Jackson County Sheriff's Department since September 26, 1979.  He is currently assigned to the Detective Unit.  (Plaintiffs' Fact #5)

---

[3]Plaintiffs allege that the e-mails were sent to other members of the Department.  (See Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 35)

4

23.     Jackson County and the FOP have entered into an agreement that recognizes the FOP as the exclusive bargaining representative for the members of the Sheriff's Department who hold a rank below captain. (Defendant's Fact #14)

### 3.     Jacob Leaming

24.     Jacob R. Leaming began working of the Jackson County Sheriff's Department in July 1988 as a dispatcher. (Defendant's Fact #15)

25.     In January 1990, Leaming was promoted from dispatcher to deputy sheriff in the patrol division. At that same time, Leaming became a member of the FOP and remained a member of the FOP at all times relevant here. (Defendant's Fact #16)

26.     In 2002, Leaming was assigned as a School Resource Officer ("SRO") to Fort Osage High School. (Plaintiffs' Fact #7)

27.     To receive an assignment as an SRO, a deputy is required to go through a formal interview process with the assistant school superintendent and the school principal. (Plaintiffs' Fact #8)

28.     Before being assigned to Fort Osage, Leaming was required to participate in a formal interview process with Assistant Superintendent James Barrows and Fort Osage High School Principal Steve Scott. (Plaintiffs' Fact #9)

## B.     Leaming's Claims Against Jackson County

### 1.     Leaming's Employment Background and Sexual Harassment Training

29.     Aside from a six month training period at the police academy and a short stint acting as courthouse security, Leaming worked in the patrol division of the Sheriff's Department from January 1990 until August 2002 when he became the SRO for Fort Osage High School. (Defendant's Fact #17)

30.     During the time he was in the patrol division, Leaming received sexual harassment training. Leaming also received sexual harassment training after he became the SRO at Fort Osage High School. (Defendant's Fact #18)

31.     In February 2002, the Sheriff's Department received a complaint that Leaming, while on duty, had made inappropriate comments to a female employee of the Lone Jack Police Department. According to Kreitler's report following the investigation, the woman made a complaint in which she stated that Leaming "made an off colored remark about giving her fifteen minutes of pleasure or the best pleasure she will ever have ... at which time he made a hand gesture by turning his palm up and bringing his middle finger up and down or back and forth." (Defendant's Fact #19)

32.     Leaming admitted to the department officer investigating the complaint that he made comments to the woman which he intended to be a joke. He admitted that he "told her that he could guarantee a woman more fun and pleasure with her clothes on in fifteen minutes that she has ever gotten from a man in bed with her clothes off ... [and] he made a hand gesture by bringing his hands up with the palms facing her and waving all his fingers." (Defendant's Fact #20)

33.     As a result of the incident in Lone Jack, Leaming received a written reprimand and was ordered to attend additional sexual harassment training. (Defendant's Fact #21)

34.     Leaming attended and completed an additional sexual harassment training course in March 2002. He also participated in a computer directed sexual harassment training session in August 2002. (Defendant's Fact #22)

35.     In August 2002, Leaming became the SRO at Fort Osage High School. (Defendant's Fact #23)

36.     The SRO program is designed to put a police officer in schools to create a positive relationship between police officers and students. Law enforcement officers in the SRO program have day-to-day contact with high school students to assist in law enforcement and provide some instruction to students. (Defendant's Fact #24)

37.     The position of SRO puts the officer in close proximity and contact with teenage girls on a daily basis. (Defendant's Fact #25)

38.     The position of SRO for the Jackson County Sheriff's Department is a position of trust. (Defendant's Fact #26)

39.     Leaming had asked to be the SRO at Fort Osage High School, and he considered it a favorable assignment. While Leaming was assigned as the SRO at Fort Osage High School, he was a member of the FOP. (Defendant's Fact #27)

40.     Leaming worked as the SRO from the summer of 2002, until the sheriff terminated his employment in July 2003. (Defendant's Fact #28)

    **2.      Investigation of Complaints Against Leaming**

41.     While Leaming was working as the SRO at Fort Osage High School, the Sheriff's Department received a complaint from the parent of two female students. The parent reported that Leaming was acting inappropriately toward her two daughters.

(Defendant's Fact #29)[4]

42.     On June 3, 2003, Captain Philip Moran of the Jackson County Sheriff's Department received a complaint from Ms. Paula Flucke regarding Leaming. (Plaintiffs' Fact #26)

43.     The complaint stated that Leaming had been making inappropriate advances toward Flucke's two daughters, Candace and Christy Case, who were students at the high school. According to the report, Leaming had allegedly asked the daughters, who were sixteen and eighteen years of age, to come over to his house and swim. Ms. Flucke also indicated to Captain Moran that she had contacted the school with her complaint, but that she wanted the Sheriff's Department to handle the investigation. (Plaintiffs' Fact #27)

44.     The parent had previously asked Leaming not to have any contact with her daughters. (Defendant's Fact #30)

45.     Despite the parent's request, Leaming continued to interact with the girls, even inviting them to swim at his house. (Defendant's Fact #31 (modified))[5]

46.     After receiving the complaint, the task of conducting the official investigation was first assigned to Leaming's immediate supervisor, Sergeant Ross Caponetto. (Plaintiffs' Fact #28)

47.     On June 5, 2003, Sergeant Caponetto interviewed Ms. Flucke at her residence. (Plaintiffs' Fact #29)

48.     During the interview, Flucke indicated to Sergeant Caponetto that she had met Leaming a year ago at youth court. At that time, Flucke's husband was a volunteer firefighter for the Fort Osage Fire Department, and her husband knew Leaming. Soon after that, Flucke's husband had a heart attack at the fire station and passed away. (Plaintiffs' Fact #30)

49.     After the passing of her husband, Leaming's wife and Flucke became friends and their children became acquaintances. She also claimed she smoked marijuana. (Plaintiffs' Fact #31)

---

[4]While plaintiffs state that this fact is controverted, the reference to the record which was provided by plaintiffs supports the fact as set forth by defendant.

[5]This fact was modified to remove the inference that Leaming initiated the contact per plaintiffs' objection as the issue of who initiated the contact is disputed.

Case 4:03-cv-00940-SWH   Document 154   Filed 04/19/06   Page 7 of 43

50.    Some time after that, Flucke and Ms. Leaming had a falling out. At the time of the interview with Sergeant Caponetto, Flucke indicated that it had been at least two months since she had seen Ms. Leaming. (Plaintiffs' Fact #32)

51.    After their falling out, Flucke told Sergeant Caponetto that she told Leaming that she did not want anything to do with his family or his wife. (Plaintiffs' Fact #33)

52.    According to her original statement, Flucke told Sergeant Caponetto that Leaming spoke to her oldest daughter, Candace Cole, at Fort Osage High School, who was a student at the school at the time. According to Flucke, Leaming asked Candace to come over to his house and swim. This supposedly took place after Leaming was told not to have contact with Flucke's daughters. According to Flucke, her daughters did not like Leaming and felt uncomfortable around him. (Plaintiffs' Fact #34)

53.    After interviewing Flucke, Sergeant Caponetto also interviewed both daughters, Candace Case and Christy Case. (Plaintiffs' Fact #35)

54.    Both daughters told Sergeant Caponetto that they socialized with Leaming's daughter, but cut off contact with her because their mom claimed that Mrs. Leaming was doing drugs. Candace admitted in her statement to Sergeant Caponetto that she had no firsthand knowledge of Ms. Leaming's drug use at the time. According to Candace Case's statement, Leaming only asked her to come over once on the last day of school. (Plaintiffs' Fact #36)

55.    Candace Case stated to Sergeant Caponetto in her initial interview that she felt uncomfortable around Leaming because of alleged statements made to other students. However, Candace Case admitted that she had never heard Leaming make inappropriate comments. (Plaintiffs' Fact #37)

56.    According to Christy Case's initial statements, Leaming invited her to go swimming twice on the same day. Like her sister, Christy Case stated that she had not directly heard any inappropriate comments from Leaming, but claimed her friends Kara Conley and Jennifer Davis had heard Leaming make inappropriate comments. (Plaintiffs' Fact #38)

57.    During the investigation of the parent's complaint, the investigating officer learned of other allegations of inappropriate behavior by Leaming. (Defendant's Fact #33)[6]

58.    Upon discovering that there might be other incidents of inappropriate conduct by

_____

[6]The factual references provided by defendant support the fact. While plaintiffs contend that this fact is controverted, plaintiffs fail to provide the Court with specific references to the record upon which they rely. Pursuant to Local Rule 56.1(a), this fact is deemed admitted.

Case 4:03-cv-00940-SWH   Document 154   Filed 04/19/06   Page 8 of 43

Leaming, Kreitler asked Internal Affairs to conduct a further investigation. (Defendant's Fact #34)

59.     On June 6, 2003, Sergeant Robert Tuttle, the Sheriff's Department Professional Standards Investigator, provided Leaming with a Notice of Professional Standards Investigation. This formally initiated the internal investigation regarding Flucke's complaint. (Plaintiffs' Fact #39)

60.     On June 11, 2003, Sergeant Tuttle contacted, via telephone, Fort Osage High School Assistant Superintendent, Jim Barrows. The conversation was not recorded, but it was memorialized in a supplemental report drafted by Sergeant Tuttle. According to Sergeant Tuttle's report, Barrows stated that he had several conversations with Leaming about his actions while employed at the school. (Plaintiffs' Fact #40)

61.     The assistant superintendent of Fort Osage School informed the investigating officer that during the school year he had a conversation with Leaming regarding "what seemed to be inappropriate behavior, concerning him [Leaming] becoming too friendly with some of the female students." (Defendant's Fact #35 (modified); Plaintiffs' Fact #42)[7]

62.     Mr. Barrows testified that after his conversation in the early fall with Leaming, he did not consider recommending that Leaming be terminated. (Plaintiffs' Fact #43 (modified))[8]

63.     On June 13, 2003, Sergeant Tuttle interviewed Christy Case at the Jackson County Sheriff's Department Headquarters. Christy Case stated that on several occasions she was present at the Leaming's house with her mother's permission. (Plaintiffs' Fact #44)

64.     Christy Case admitted that she was not present when her mother informed Leaming and his wife that they were not to have contact with her daughters. (Plaintiffs' Fact #45)

65.     Christy Case stated that Leaming had contacted her once in early May and then a second time about three weeks later. (Plaintiffs' Fact #46)

66.     When asked how she felt with respect to Leaming, Christy Case advised Sergeant

_____

[7]Per plaintiffs' objection, this fact was modified to remove the inference that during the school year, the assistant superintendent had more than one conversation with Leaming about this issue.

[8]This fact was modified to reflect the actual testimony.

9

Tuttle of the following:

> Q.     At this time do you feel in fear of Dep. Leaming?
>
> A.     I don't want to be around him.
>
> Q.     Okay, but if you encountered him say, on a public street, at a shopping mall or at the grocery store, would you feel uncomfortable?
>
> A.     Yes.
>
> Q.     And that's because?
>
> A.     He just makes me uncomfortable.
>
> Q.     Because of the relationship between you a student and him a School Resource Officer, I mean, explain, why do you feel uncomfortable?
>
> A.     He just makes me uncomfortable. I really don't have a reason.

(Plaintiffs' Fact #47 (modified))[9]

67.     On June 16, 2003, Sergeant Tuttle re-interviewed Flucke at Sheriff's Department Headquarters. In her interview with Sergeant Tuttle, Flucke admitted that she has had a social relationship with Leaming's wife and talked to her at least once a week for a period of months. Flucke refused to answer the question of whether she had smoked marijuana in the past. (Plaintiffs' Fact #48 (modified))[10]

68.     On June 17, 2003, Sergeant Tuttle conducted a telephone interview with Steve Scott, the principal at Fort Osage High School. (Plaintiffs' Fact #49)

69.     Mr. Scott stated that he had not been contacted by any parent or student about a problem with the way that Leaming was doing his job at the school. Mr. Scott stated that he was not aware of any complaint about Leaming. (Plaintiffs' Fact #50)

70.     Mr. Scott stated to Sergeant Tuttle that he was not able to recall any discussion with Leaming about any negative behavior. Mr. Scott later testified that Leaming was responsible for enforcing the dress code at the high school. (Plaintiffs' Fact #51)

---

[9]This fact was modified to reflect the actual testimony.

[10]This fact was modified to reflect the actual testimony.

71. The internal affairs investigation revealed reports from female students that Leaming's actions and comments made them feel "uncomfortable." One student stated that he had made a "hey good looking" whistle at her, which she described as "kinda gross." Another student stated that on a cold December day, Leaming told her to come into his office where he would warm her up. She reported that Leaming's comments made her feel uncomfortable. (Defendant's Fact #36)[11]

72. The student stated that Leaming also made comments about her clothes that made her feel uncomfortable:

> Q:     Also in the report it says you made some comments about comments made by Dep. Leaming in reference to some clothing that you wore at the school and maybe some of the other students. Could you kind of expound on that? You said something about the way ...
>
> A:     I was just wearing a pair of jeans and I mean, or, you know, a couple of times he'd just say how they looked good on me and they were, how any of the, you could just always see him looking at other girls, like if their shirts were cut low. He's just always looking at them.
>
> ***
>
> Q:     Okay. And when these comments were made about the jeans you were wearing or a shirt you were wearing, how did that make you feel?
>
> A:     Uncomfortable. It's just weird, I don't know. You just don't picture a cop saying these kinds of things to you, I don't know. They just kinda, kinda, cause they're special.

(Defendant's Fact #37)

73. On June 18, 2003, Sergeant Tuttle interviewed Leaming at the Sheriff's Department Headquarters. (Plaintiffs' Fact #52)

74. According to the investigation, on at least one occasion, when Leaming invited the older daughter [Candace Case] to come swimming at his house, she told him that her mother did not want her having any contact with Leaming. During the investigation of this incident, Leaming stated:

---

[11]The factual references provided by defendant support the fact. While plaintiffs contend that this fact is controverted, plaintiffs fail to provide the Court with specific references to the record upon which they rely. Pursuant to Local Rule 56.1(a), this fact is deemed admitted.

11

I believe I told her that she was eighteen (18), she wasn't living at home and she was more than welcome, as an adult, to make the decision if she wanted to come over to the house, she could. I can understand where she didn't want to upset her mom, but she was still more than welcome with her and her boyfriend to come over and go swimming any time they want to.

(Defendant's Fact #32 (modified))[12]

75. Although Leaming admitted to Sergeant Tuttle that he did invite Candace Case to go swimming at his home, at the time he made the invitation he believed Candace Case was living at her boyfriend's house. Leaming was also asked about whistling at student, Ashley Terrell. Leaming stated that he did not remember whistling at a student, but that if he did, it was only to get her attention. (Plaintiffs' Fact #53 (modified))[13]

76. Leaming also states that he had several conversations with student, Kara Conley, while on duty at the high school. Leaming stated that he did not know why Ms. Conley would be wanting to make a complaint against him. (Plaintiffs' Fact #54 (modified))[14]

77. On June 23, 2003, Sergeant Tuttle conducted a telephone interview with Becka Sinclair. The telephone conversation was not transcribed, instead Sergeant Tuttle prepared a supplemental report summarizing the contents of the conversation. (Plaintiffs' Fact #55)

78. During the interview, Ms. Sinclair stated that she was not aware of any actions taken by Leaming that could be considered inappropriate. (Plaintiffs' Fact #56)

79. Furthermore, Sinclair stated that she did not witness or hear of any behavior by Leaming that she would consider inappropriate toward other students. (Plaintiffs' Fact #57)

80. Also on June 23, 2003, Sergeant Tuttle conducted a telephone interview with Jennifer Davis. Like Ms. Sinclair's statement, Ms. Davis' statement was not transcribed, but only summarized in a supplemental report prepared by Sergeant Tuttle. According to the report, Ms. Davis stated that she and Leaming often "kidded each other back and forth" at school, but she never felt threatened by Leaming's behavior. However, Ms. Davis also stated that Leaming did seem to stare a lot at the

---

[12]This fact was modified to remove the sentence with which plaintiffs took issue.

[13]This fact was modified to reflect the actual testimony.

[14]This fact was modified to reflect the actual testimony.

Case 4:03-cv-00940-SWH   Document 154   Filed 04/19/06   Page 12 of 43

female students and sometimes that made her feel uncomfortable. (Plaintiffs' Fact #58 (modified))[15]

81.     Ms. Davis also stated that she knew both Christy and Candace Case and that she believed that they were family friends of Mr. and Mrs. Leaming. (Plaintiffs' Fact #59)

82.     According to the report, Ms. Davis also stated that she never witnessed or overheard any inappropriate comments made by Leaming toward other female students. (Plaintiffs' Fact #60)

83.     On July 15, 2003, Sergeant Tuttle interviewed Ashley Terrell at the Jackson County Sheriff's Department. Her statement, unlike the others, was transcribed. (Plaintiffs' Fact #61)

84.     In her statement, Ms. Terrell discussed a situation in which Leaming allegedly whistled at her at school. Ms. Terrell could not recall when it occurred. Sergeant Tuttle then asked if the whistle was like an attention getting whistle, or was it like a "wolf whistle," or was it like a "Hey, good-looking whistle?" Ms. Terrell responded it was a "Hey, good-looking whistle. It was not an attention-getting." (Plaintiffs' Fact #62)

85.     According to Ms. Terrell's statement, no one else was present at the time. (Plaintiffs' Fact #63)

86.     On June 17, 2003, Sergeant Tuttle interviewed Aubrey Phillips. Ms. Phillips stated to Sergeant Tuttle that she "overheard the school resource officer referring to several female students about the sexy clothing that they were wearing and about how sexy the female students looked." She could not elaborate on the specific comments allegedly made by Leaming. Ms. Phillips also stated that "the conversation made her feel uncomfortable and that she felt that it was inappropriate behavior for the school resource officer to be saying those things about the female students at the school." (Plaintiffs' Fact #64 (modified))[16]

87.     On June 24, 2003, Sergeant Tuttle interviewed Kara Conley. (Plaintiffs' Fact #65 (modified))[17]

88.     Ms. Conley stated that on one occasion she had asked Leaming for a ride to her

[15]This fact was modified to more accurately reflect the information in the report.

[16]This fact was modified to more accurately reflect the information in the report.

[17]This fact was modified to reflect the correct date of the interview.

13

vehicle. She could not say when this incident occurred, but it was during one of the winter months. (Plaintiffs' Fact #66)

89. According to Ms. Conley, Leaming responded that he could not take her to her vehicle, but when she came back to school she could come to his office and he would warm her up. Conley stated that the comment made her feel uncomfortable and that she felt it was inappropriate for Deputy Leaming to make that kind of a statement. (Plaintiffs' Fact #67 (modified))[18]

90. Kara Conley also stated that several times throughout the school year, Deputy Leaming would comment to her and other female students how good they looked in the jeans or clothes that they were wearing. Ms. Conley stated that when these comments were made, it made her feel uncomfortable. (Plaintiffs' Fact #68 (modified))[19]

91. During the investigation into Leaming's conduct, the Sheriff's Department also received an allegation that Leaming may have acted inappropriately with a female member of the school staff. (Defendant's Fact #38)[20]

92. Leaming and the staff member spoke several times a week throughout the school year. At some point during their conversations, she indicated that she had an interest in motorcycles, and Leaming told her that he owned a motorcycle. (Defendant's Fact #39; Plaintiffs' Fact #71 and #72)

93. Because he was an SRO, the Sheriff's Department had assigned Leaming a patrol car so that he could perform his duties, and transport prisoners or unruly students, if necessary. (Defendant's Fact #40)

94. In the spring of 2003, while on duty and without permission, Leaming drove his personal Harley-Davidson motorcycle to Fort Osage High School. He informed the staff member that he had brought his motorcycle to school, and invited her to look at it. (Defendant's Fact #41)

95. When they went outside to look at his motorcycle, she asked if she could sit on it, which she did. (Defendant's Fact #42)

96. Leaming told her the motorcycle was equipped with a vibrator in the seat which was

---

[18]This fact was modified to more accurately reflect the information in the report.

[19]This fact was modified to more accurately reflect the information in the report.

[20]While plaintiffs state that this fact is controverted, the reference to the record which was provided by plaintiffs does not dispute the fact as set forth.

14

a "special gift" for his wife. (Defendant's Fact #43; Plaintiffs' Fact #73)

97.     On July 8, 2003, Colonel Kreitler sent a memo to Sheriff Phillips recommending the termination of Leaming. (Plaintiffs' Fact #69)

98.     In a statement given to the investigating officer on July 24, 2003, the day after Leaming was discharged, the staff member, Debra Smith, director of technology at Fort Osage High School, said:

> Uhm, he just started up his motorcycle and I just sat on it. Cause that was part of the thing, I said that I'd never been on a Harley. And so he said, you know, you going to take a ride? I said no, that's probably not what we should do. So he just started it up and I was just looking at it and I just sat on it and then that's when he said well I have something special on my seat, let me show you. And then turned on the seat which has like a vibration in the seat.

> * * *

> Q.      Okay. Was anything else discussed before or after that, that you got off the motorcycle?

> A.      No, he just said, you know, that he uh, as a gift to his wife, that's why he put it on there. And I said I'd never seen that, but I really don't want to know what it's for or what it's about and he just laughed, and we pretty much went back in and left the conversation at that and never discussed it again.

(Defendant's Fact #44; Plaintiffs' Fact #70)

99.     When asked whether Leaming had acted inappropriately, Ms. Smith responded: "That's very difficult to say. It was odd. It was probably uncomfortable to have that on. I mean I could have sat on it and never known about that, the vibrator thing in the seat and probably would have been just fine." However, Ms. Smith wrote on the transcript that while she agreed to the fact that the vibrator did not need to be shown, she was not agreeing to it being inappropriate. (Plaintiffs' Fact #74 (modified))[21]

100.    During this incident, Leaming was on duty and in the uniform of a deputy sheriff. (Defendant's Fact #45)

### 3.      Leaming's Discharge

---

[21]This fact was modified to reflect the actual testimony.

101. During the Sheriff's Department investigation into Leaming's conduct, the investigating officer interviewed witnesses, including Leaming. (Defendant's Fact #46)

102. At the conclusion of the investigation, and based on the statements, interview notes, and other evidence, Kreitler recommended to Sheriff Phillips that Leaming's employment should be terminated. (Defendant's Fact #47)

103. On the July 21, 2003 Notice of Pre-Termination Hearing, the Sheriff indicated that Leaming allegedly violated several Department policies stemming from allegations of making sexual comments while on duty to at least six different high school students during his assignment as a School Resource Officer at Fort Osage High School during the 2002-03 school year. (Plaintiffs' Fact #75)

104. At his pre-termination hearing, Leaming stated that he did not believe there was anything wrong with his conduct regarding the staff member and the motorcycle. (Defendant's Fact #48)

105. The sheriff, as the final decision-maker, reviewed the investigation statements, interview notes and other evidence. He determined that Leaming's conduct had violated the rules and policies of the Sheriff's Department. Sheriff Phillips testified that considered with the prior incident in Lone Jack which had resulted in discipline, including additional sexual harassment training which had not corrected the problem, he decided Leaming's employment should be terminated. (Defendant's Fact #49 (modified))[22]

106. Plaintiff Leaming received a Notice of Discharge from the Human Resources Department of Jackson County, Missouri on July 23, 2003. (Complaint at ¶ 22; Answer at ¶ 22)

C.    **The FOP's Claims Against Jackson County**

1.    **Memoranda of Understanding/Collective Bargaining**

107. In August of 1999, the Jackson County Legislature passed a Recognition Resolution which effectively recognized the FOP as the exclusive bargaining representative for all Jackson County Sheriff's Department employees of the rank of sergeant and below. (Plaintiffs' Fact #14; Defendant's Fact #50)

---

[22]The factual references provided by defendant support that Sheriff Phillips testified that these were the reasons Leaming's employment was terminated. While plaintiffs contend that this fact is controverted, plaintiffs fail to provide the Court with specific references to the record upon which they rely. Pursuant to Local Rule 56.1(a), this fact is deemed admitted.

Case 4:03-cv-00940-SWH   Document 154   Filed 04/19/06   Page 16 of 43

108. With the passage of the Recognition Resolution, representatives of the Jackson County Sheriff's Department and the FOP began negotiating the first collective bargaining agreement. (Plaintiffs' Fact #15)

109. The FOP and Jackson County negotiated the first Memorandum of Understanding ("MOU") between 1999 and 2001. The FOP negotiation committee that negotiated the first MOU consisted of Joseph Becker, Bob Scarbo, Jacob Leaming, Rhonda Montgomery, Martin Hendrickson, and Mike Rowland. (Defendant's Fact #51)

110. The first MOU by and between the Jackson County Sheriff's Department and the FOP was signed on January 22, 2001 and expired on December 31, 2002. (Plaintiffs' Fact #16; Defendant's Fact #52) The first MOU did not have an evergreen clause, which would have allowed the agreement to continue until a successor agreement was signed. (Plaintiffs' Fact #21)

111. Before the first MOU expired, the FOP and Jackson County began negotiating on a second MOU in September 2002. During negotiations, the FOP designated members to serve as negotiators. The Negotiating Committee is normally comprised of deputies from different areas within the Department. The FOP negotiating team for the second MOU included Joseph Becker, Mike Buffalow, Jacob Leaming, Charles DeGroff, Mike Rowland, Steve Leone, John Payne and Dave Epperson. (Defendant's Fact #53; Plaintiffs' Fact #17 and #18) During most of the negotiation sessions, Leaming served as the Chairman of the Negotiating Committee. (Plaintiffs' Fact #18)

112. During negotiations, Mr. Jim Velghe served as chief spokesperson for the Jackson County Sheriff's Department. According to Sergeant Becker, during one of the first negotiation sessions, Mr. Velghe told the FOP negotiators that the "Collective Bargaining Agreement was not a contract, as far as the county was concerned, there was no collective bargaining, there was no binding arbitration, there was no fair share agreement, and Sergeants would not be part of the contract. Those issues were non-negotiable." This position represented a drastic change from the County's previous position during negotiation of the first MOU. (Plaintiffs' Fact #19)

113. The FOP claims that the County opened the MOU negotiations by announcing that several items were non-negotiable: binding arbitration, "fair share," and the exclusion of sergeants in the MOU. Eventually, the sheriff agreed to binding arbitration and included sergeants in the current MOU. In addition, the FOP also obtained an "evergreen clause" in the second MOU, which meant that the terms of the second MOU remained in effect until a new MOU was negotiated. (Defendant's

Fact #54 (modified))[23]

114.　In the midst of negotiations, Mr. Velghe, the County representative, told Sergeant Becker that Becker's opposition to certain issues was due to a personal conflict with Sheriff Phillips and he made remarks that Becker was directing the FOP to resist the sheriff. Mr. Velghe also called Sergeant Becker a liar. (Plaintiffs' Fact #22)

115.　After negotiations ceased, the Sheriff sent out various letters, making derogatory comments about Sergeant Becker, the FOP's attorney and the FOP's approach during negotiations. The letters were sent to the Jackson County legislature, including a letter sent by Captains on Department letterhead, claiming that the FOP was a self-interested group that was telling lies about the Sheriff. (Plaintiffs' Fact #24)[24]

## 2. Kreitler's Comments to FOP Members

116.　The FOP alleges that Kreitler tried to intimidate potential FOP members. The FOP also claims that Colonel Kreitler was "disrespectful" to the FOP during negotiations by making comments about Joseph Becker, an FOP negotiator. (Defendant's Fact #55 (modified))[25]

117.　Also during negotiations, Colonel Kreitler told members of the FOP that Sergeant Becker mistreated Mr. Velghe at the negotiating table and was very disrespectful. (Plaintiffs' Fact #23 (modified))[26]

118.　One potential member, Deputy Kelli Hemstock, had to fill out a second FOP membership form because the Sheriff's Department lost her first. When that potential FOP member was filling out her application, Kreitler stood behind her, watched her fill out the paperwork, and commented "It's a never-ending cycle, isn't it Sheri? Three people drop, and one joins, isn't that interesting." He then laughed and exited her office. (Defendant's Fact #56; Plaintiffs' Fact #78)

---

[23]This fact was modified to remove the inference that the sheriff did not initially oppose binding arbitration and the inclusion of sergeants in the MOU.

[24]The factual references provided by plaintiffs support the fact.

[25]The factual references provided by defendant support the fact as set forth. While plaintiffs contend that this fact is controverted, plaintiffs fail to provide the Court with specific references to the record upon which they rely. Pursuant to Local Rule 56.1(a), this fact is deemed admitted.

[26]The factual references provided by plaintiffs only support the portion of the fact set forth.

Case 4:03-cv-00940-SWH   Document 154   Filed 04/19/06   Page 18 of 43

119. After another potential member, Deputy Rusty Nicholson, rejoined the FOP, Kreitler told him that his rejoining the FOP would be a "slap in the face" to the sheriff. (Defendant's Fact #57)

120. Deputy Nicholson took this to mean that joining the FOP was, in fact, going against the Sheriff. However, on other occasions, Colonel Kreitler told Deputy Nicholson that the FOP was a great organization. When asked if he had the impression that Colonel Kreitler at any time tried to intimidate him or pressure him into not rejoining, Deputy Nicholson responded "No." (Plaintiffs' Fact #77 (modified))[27]

### 3. Promotion Former FOP Member to Sergeant

121. The FOP maintains, as part of its cause of action, that a deputy was promoted after he left the FOP. (Defendant's Fact #59)

122. According to Becker, then Deputy Newberry quit the FOP in December 2002. (Defendant's Fact #60)

123. In March 2003, Newberry was promoted from deputy to sergeant. (Defendant's Fact #61)

124. Under the previous MOU, which had expired, promotions were to be from the top five candidates on the promotion list. Although he did not have to follow the expired MOU at that time, the sheriff selected Newberry for promotion from deputy to sergeant. Newberry was one of the top five candidates on the eligibility list. (Defendant's Fact #62)

### 4. Termination of Deputy's Employment for Comments on a Website Chat Room

125. The FOP asserts that Sheriff Phillips discharged Deputy LaFramboise because he was an FOP member who "exercised his freedom of speech and voiced his opinion on a public Web site." (Defendant's Fact #63)

126. LaFramboise was a deputy sheriff for the Jackson County Sheriff's Department from September 2001 until August 2004, where his employment was terminated for insubordination. (Defendant's Fact #64)

127. Prior to his termination, LaFramboise posted writings on the website referring to Sheriff Phillips as a "bastard" and a "liar." (Defendant's Fact #65)

---

[27]This fact was modified to reflect the actual testimony.

### 5.   Alleged Disparate Treatment Regarding Weapons Incidents

128.   The FOP claims that in May 2003, Sergeant Newberry, who was not a member of the FOP, pointed his firearm at another officer, but was not punished for this act, whereas in 2001 when another officer, Deputy Hughes, who was an FOP member, pointed his firearm at an officer, he was terminated.  (Defendant's Fact #66)

129.   An investigation into the Hughes incident revealed that Deputy Hughes had drawn his weapon and pointed it at the other officer in anger over something the officer had said.  Hughes received a Notice of Pre-Termination Hearing.  Before the hearing took place, Deputy Hughes requested to resign and the sheriff permitted him to do so without holding the pre-termination hearing.  (Defendant's Fact #67)

130.   An investigation into the Newberry incident revealed that Newberry had been discussing the Hughes incident with other officers in a joking manner when he drew his weapon and pointed it in the direction of another officer, mimicking Hughes' conduct.  The investigation revealed that Newberry did not do so in a threatening manner.  As a result, Sergeant Newberry received a written reprimand and an extension of his probationary period as a sergeant.  (Defendant's Fact #68)[28]

131.   In discovery in this case, Jackson County produced, under a protective order, the personnel files of every member of the Department who has been investigated, disciplined, promoted or discharged since July 23, 1998.  The records comprise over 26,000 pages.  (Defendant's Fact #69)

### 6.   Offensive E-mails

132.   The FOP alleges that the sheriff failed to investigate an anonymous e-mail that made disparaging remarks about the FOP.  The e-mail states that it was sent by "William Wallace."  No one seems to know a William Wallace, and that name appears to be the name of a movie character.  (Defendant's Fact #70)

133.   There is no evidence that Sheriff Phillips, Colonel Kreitler, or the command staff sent the e-mail, directed someone to send the e-mail, condoned it or even knew about it until it was brought to their attention.  (Defendant's Fact #71)

134.   Sheriff Phillips did not order an investigation regarding that particular e-mail. (Defendant's Fact #72)

---

[28]The factual references provided by defendant support the fact.  While plaintiffs contend that this fact is controverted, plaintiffs fail to provide the Court with specific references to the record upon which they rely.  Pursuant to Local Rule 56.1(a), this fact is deemed admitted.

Case 4:03-cv-00940-SWH   Document 154   Filed 04/19/06   Page 20 of 43

## 7.    **Three Stooges Picture**

135.    The FOP claims that the sheriff allowed an employee to post a picture of the Three Stooges with the caption "FOP Board" (or words to that effect) in a cubicle in the department office.  (Defendant's Fact #73)

136.    The Three Stooges picture was removed after an employee complained about it. (Defendant's Fact #74)

## III.  DISCUSSION

In their Complaint, plaintiffs allege that defendant has retaliated against them for exercising their rights guaranteed under the United States Constitution, thus violating the provisions of 42 U.S.C. § 1983.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...

To prove a claim under section 1983, a plaintiff must establish:  (1) the defendant acted under color of state law; and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right.  See Luckes v. County of Hennepin, 415 F.3d 936, 939 (8th Cir. 2005). Defendant Jackson County does not dispute that it acted under color of state law.  (Suggestions in Support of Defendant Jackson County's Motion for Summary Judgment at 16)  Thus, the only issue is whether Jackson County engaged in conduct that deprived either Leaming or the FOP of a constitutionally protected federal right.

## A.    Jacob Leaming's Claim

Plaintiff Leaming alleges that defendant terminated his employment "in retaliation for the exercise of his First Amendment Rights of Freedom of Speech and Association." (Complaint at ¶

21

24)  In order for Leaming to maintain a claim under 42 U.S.C. § 1983 for First Amendment retaliation, he must show:  (1) that he engaged in protected conduct; (2) that an adverse action was taken against him; and (3) that there was a causal connection between the first two elements, i.e., that the adverse action was motivated, at least in part, by the protected conduct.  See Bechtel v. City of Belton, 250 F.3d 1157, 1162 (8th Cir. 2001); Green v. St. Louis Hous. Auth., 911 F.2d 65, 70 (8th Cir. 1990); King v. Haas, 2002 WL 32882706, *4 (S.D. Ohio Sept. 4, 2002), aff'd, 85 Fed. Appx. 480 (6th Cir. 2004).  Plaintiff Leaming bears the burden of establishing that his conduct was constitutionally protected and that this conduct was a substantial or motivating factor in the decision to terminate him.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  If Leaming makes this initial showing, the burden shifts to the County to show by a preponderance of the evidence that Leaming would have been terminated, even in the absence of any protected conduct.  Id.; Tarpley v. Jeffers, 96 F.3d 921, 928 (7th Cir. 1996).  Leaming then has an opportunity to prove that the reasons given by the County are pretextual.  See Hudson v. Norris, 227 F.3d 1047, 1051 (8th Cir. 2000).

The dispute between the parties centers on the third element of a retaliation claim, i.e. that there was a causal connection between plaintiff Leaming's union activity and his termination. Plaintiff Leaming seeks to carry his burden of establishing that his union activity was a substantial or motivating factor in the decision to terminate him by arguing:  (1) the timing of the termination sufficiently establishes a causal connection between his union activity and the termination; and (2) defendant's proferred reasons for the termination are insubstantial.  (Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 24-30)

The following undisputed facts are relevant with respect to the timing issue:

Case 4:03-cv-00940-SWH   Document 154   Filed 04/19/06   Page 22 of 43

1. The FOP and Jackson County negotiated the first Memorandum of Understanding ("MOU") between 1999 and 2001. Jacob Leaming was on the FOP negotiation committee that negotiated the first MOU. (Undisputed Fact #109, supra)

2. The first MOU expired on December 31, 2002. (Undisputed Fact #110, supra)

3. Before the first MOU expired, the FOP and Jackson County began negotiating on a second MOU in September 2002. The FOP negotiating team for the second MOU included Joseph Becker, Mike Buffalow, Jacob Leaming, Charles DeGroff, Mike Rowland, Steve Leone, John Payne and Dave Epperson. During most of the negotiation sessions, Leaming served as the Chairman of the Negotiating Committee. (Undisputed Fact #111, supra)

4. During negotiations, Jim Velghe served as chief spokesperson for the Jackson County Sheriff's Department. According to Sergeant Becker, during one of the first negotiation sessions, Mr. Velghe told the FOP negotiators that the "Collective Bargaining Agreement was not a contract, as far as the county was concerned, there was no collective bargaining, there was no binding arbitration, there was no fair share agreement, and Sergeants would not be part of the contract. Those issues were non-negotiable." (Undisputed Fact #112, supra)

5. In the midst of negotiations, Mr. Velghe told Sergeant Becker that Becker's opposition to certain issues was due to a personal conflict with Sheriff Phillips and he made remarks that Becker was directing the FOP to resist the sheriff. Mr. Velghe also called Sergeant Becker a liar. (Undisputed Fact #114, supra)

6. After negotiations ceased, the Sheriff sent out various letters,[29] making derogatory comments about Sergeant Becker, the FOP's attorney and the FOP's approach during negotiations. The letters were sent to the Jackson County legislature, including a letter sent by Captains on Department letterhead, claiming that the FOP was a self-interested group that was telling lies about the Sheriff. (Undisputed Fact #115, supra)

7. On June 3, 2003, Captain Philip Moran of the Jackson County Sheriff's Department received a complaint from Ms. Paula Flucke regarding Leaming. (Undisputed Fact #42, supra)

---

[29]The two letters provided by plaintiffs are dated January 10, 2003. (See Plaintiffs' Exhibits at 20)

8. Upon discovering that there might be other incidents of inappropriate conduct by Leaming, Kreitler asked Internal Affairs to conduct a further investigation. (Undisputed Fact #58, <u>supra</u>)

9. At the conclusion of the investigation, and based on the statements, interview notes, and other evidence, Kreitler recommended to Sheriff Phillips that Leaming's employment should be terminated. (Undisputed Fact #102, <u>supra</u>)

10. Plaintiff Leaming received a Notice of Discharge from the Human Resources Department of Jackson County, Missouri on July 23, 2003. (Undisputed Fact #106, <u>supra</u>)

A review of these facts does not establish a causal connection between plaintiff Leaming's union activity and his termination. These facts establish that Leaming had been involved in negotiating MOUs on behalf of the FOP since 1999. While there may have been some tensions in the negotiations during the fall of 2002 and spring of 2003, the facts do not suggest that these tensions had anything to do with Leaming's termination. The only connection appears to be plaintiffs' speculation "that this animosity was directed at [Leaming], as well as others serving on the FOP Negotiating Committee[30] and, in turn, was the true basis for his termination." (Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 26) Plaintiffs rely merely on innuendo and conclusory allegations for their claim. Innuendo and conclusory allegations will not defeat a motion for summary judgment. <u>See</u> <u>Green v. St. Louis Hous. Auth.</u>, 911 F.2d 65, 70 (8th Cir. 1990). No facts have been presented to suggest that Leaming (as opposed to Sergeant Becker or the FOP's attorney) was ever mentioned in relation to the negotiation tensions. Plaintiff Leaming's employment was terminated on July 23, 2003, ten months after the negotiations for the second MOU began and seven months after the first MOU expired. Rather than being tied with his

---

[30]The Court notes that plaintiffs have offered no evidence of other members of the FOP Negotiating Committee suffering adverse employment actions.

union activity, the timing of plaintiff Leaming's termination is directly related to the complaint against him which was received on June 3, 2003, and the resulting investigation.

Plaintiff's second argument (that defendant's preferred reasons for the termination[31] are insubstantial) in support of his position that his union activity was a substantial or motivating factor in the decision to terminate him must also fail. The following undisputed facts are relevant with respect to this issue:

1. During the time he was in the patrol division, Leaming received sexual harassment training. (Undisputed Fact #30, supra)

2. In February 2002, the Sheriff's Department received a complaint that Leaming, while on duty, had made inappropriate comments to a female employee of the Lone Jack Police Department. According to Kreitler's report following the investigation, the woman made a complaint in which she stated that Leaming "made an off colored remark about giving her fifteen minutes of pleasure or the best pleasure she will ever have ... at which time he made a hand gesture by turning his palm up and bringing his middle finger up and down or back and forth." (Undisputed Fact #31, supra)

3. Leaming admitted to the department officer investigating the complaint that he made comments to the woman which he intended to be a joke. (Undisputed Fact #32, supra)

4. As a result of the incident in Lone Jack, Leaming received a written reprimand and was ordered to attend additional sexual harassment training. (Undisputed Fact #33, supra)

5. Leaming attended and completed an additional sexual harassment training course in March 2002. He also participated in a computer directed sexual harassment training session in August 2002. (Undisputed Fact #34, supra)

6. In August 2002, Leaming became the SRO at Fort Osage High School.

_____

[31]Sheriff Phillips testified that he determined that Leaming's conduct had violated the rules and policies of the Sheriff's Department. Sheriff Phillips further testified that considered with the prior incident in Lone Jack which had resulted in discipline, including additional sexual harassment training which had not corrected the problem, he decided Leaming's employment should be terminated. (Undisputed Fact #105, supra)

Case 4:03-cv-00940-SWH   Document 154   Filed 04/19/06   Page 25 of 43

(Undisputed Fact #35, <u>supra</u>)

7.  While Leaming was working as the SRO at Fort Osage High School, the Sheriff's Department received a complaint from Paula Flucke, the parent of two female students. (Undisputed Fact #41, <u>supra</u>)

8.  The complaint stated that Leaming had been making inappropriate advances toward Flucke's two daughters, Candace and Christy Case, who were students at the high school. According to the report, Leaming had allegedly asked the daughters, who were sixteen and eighteen years of age, to come over to his house and swim. (Undisputed Fact #43, <u>supra</u>)

9.  Ms. Flucke had previously asked Leaming not to have any contact with her daughters. (Undisputed Fact #44, <u>supra</u>)

10. According to the investigation, when Leaming invited Candace Case to come swimming at his house, she told him that her mother did not want her having any contact with Leaming. Leaming admitted to the investigator that he told Candace "that she was eighteen, she wasn't living at home and she was more than welcome, as an adult, to make the decision if she wanted to come over to the house, she could." (Undisputed Fact #74, <u>supra</u>)

11. Candace Case stated to Sergeant Caponetto in her initial interview that she felt uncomfortable around Leaming because of alleged statements made to other students. However, Candace Case admitted that she had never heard Leaming make inappropriate comments. (Undisputed Fact #55, <u>supra</u>)

12. Like her sister, Christy Case stated that she had not directly heard any inappropriate comments from Leaming, but claimed her friends Kara Conley and Jennifer Davis had heard Leaming make inappropriate comments. (Undisputed Fact #56, <u>supra</u>)

13. The assistant superintendent of Fort Osage School informed the investigating officer that during the school year he had a conversation with Leaming regarding "what seemed to be inappropriate behavior, concerning him [Leaming] becoming too friendly with some of the female students." (Undisputed Fact #61, <u>supra</u>)

14. Jennifer Davis, a student at Fort Osage, told the investigator that Leaming seemed to stare a lot at the female students and sometimes that made her feel uncomfortable. (Undisputed Fact #80, <u>supra</u>)

15. Ashley Terrell, another student at Fort Osage, told the investigator of an instance where Leaming whistled at her at school. Sergeant Tuttle asked if

the whistle was like an attention getting whistle, or was it like a "wolf whistle," or was it like a "Hey, good-looking whistle?" Ms. Terrell responded it was a "Hey, good-looking whistle. It was not an attention-getting." She described it as "kinda gross." (Undisputed Fact #71, #84, supra)

16. Aubrey Phillips, another student at Fort Osage, stated to Sergeant Tuttle that she "overheard the school resource officer referring to several female students about the sexy clothing that they were wearing and about how sexy the female students looked." Ms. Phillips also stated that "the conversation made her feel uncomfortable and that she felt that it was inappropriate behavior for the school resource officer to be saying those things about the female students at the school." (Undisputed Fact #86, supra)

17. Kara Conley, another student at Fort Osage, told the investigator that on one occasion in the winter, she had asked Leaming for a ride to her vehicle. According to Ms. Conley, Leaming responded that he could not take her to her vehicle, but when she came back to school she could come to his office and he would warm her up. Conley stated that the comment made her feel uncomfortable and that she felt that it was inappropriate for Deputy Leaming to make that kind of a statement. (Undisputed Fact #88 and #89, supra)

18. Kara Conley also stated that several times throughout the school year, Deputy Leaming would comment to her and other female students how good they looked in the jeans or clothes that they were wearing. Ms. Conley stated that when these comments were made, it made her feel uncomfortable. (Undisputed Fact #90, supra)

19. During the investigation into Leaming's conduct, the Sheriff's Department also received an allegation that Leaming may have acted inappropriately with a female member of the school staff. (Undisputed Fact #91, supra)

20. In the spring of 2003, while on duty and without permission, Leaming drove his personal Harley-Davidson motorcycle to Fort Osage High School. He informed Debra Smith, a female staff member, that he had brought his motorcycle to school, and invited her to look at it. When they went outside to look at the motorcycle, Smith asked if she could sit on it, which she did. Leaming then started the motorcycle. According to Smith, Leaming then told her that he had something special on the seat and turned on a vibrator in the seat. Leaming said the vibrator was a "special gift" for his wife. (Undisputed Fact #94, #95, #96 and #98, supra)

21. At his pre-termination hearing, Leaming stated that he did not believe there was anything wrong with his conduct regarding the staff member and the

27

motorcycle.  (Undisputed Fact #104, <u>supra</u>)

Contrary to plaintiffs' argument, a review of these facts does not establish that defendant's preferred reasons for the termination are insubstantial.  Rather, they demonstrate that although plaintiff Leaming had received sexual harassment training several times and had been previously disciplined for inappropriate conduct, he continued to demonstrate such conduct (this time in a high school setting) and refused to acknowledge that his conduct was in any way inappropriate.

Plaintiff Leaming has not established that his union activities were a substantial or motivating factor in the decision to terminate him.  But even if he had met this burden, the County has presented sufficient evidence to meet its burden of showing that Leaming would have been terminated, even in the absence of any protected conduct.  The evidence set forth above to dispute plaintiffs' argument that defendant's preferred reasons for the termination are insubstantial establishes that plaintiff would have been terminated, even in the absence of any union activity.  The sheriff had substantial evidence from the investigative record that Leaming acted inappropriately toward several female students, as well as one female staff member.  Defendant's identification of Leaming's continuing inappropriate behavior sufficiently set forth legitimate, nondiscriminatory reasons for Leaming's discharge.

Finally, plaintiffs argue that defendant's stated reasons for terminating Leaming are pretextual because termination is too harsh a punishment for Leaming's actions.  According to plaintiffs, in more egregious situations involving non-FOP members, defendant chose to administer less stringent discipline. (Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 34)  Plaintiffs argue that Sergeant Lane Eitel and Sergeant Ross Caponetto, neither of whom was an FOP member, received only short suspensions after sending sexually explicit e-mails

28

to other members of the Department using Department computers.  (Id. at 34-35)  When presenting instances of disparate treatment to support a claim of pretext, a plaintiff bears the burden of establishing that disparately treated individuals are similar to the plaintiff in all relevant respects. See Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994).  "To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." Id.  Plaintiffs have failed to establish that Eitel and Caponetto were similarly situated to Leaming.  In fact, their situations were quite different from Leaming's situation.  Eitel and Caponetto sent inappropriate e-mails to other members of the Department,[32] thus their inappropriate conduct did not go outside the Department.  In contrast, Leaming's conduct occurred outside the Department, in a school setting, where it could affect the public's perception of the Jackson County Sheriff's Department.  Leaming's conduct involved high school girls with whom Leaming was supposed to have a relationship of trust.  There is no evidence that Eitel's and Caponetto's conduct violated a trust relationship.  Finally, Leaming had previously been disciplined and received additional sexual harassment training in an attempt to correct inappropriate behavior.  No evidence was presented to suggest that Eitel or Caponetto had ever been disciplined for similar misconduct. Employees are not considered similarly situated in all relevant respects where they do not have comparable disciplinary histories.  See Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691-92 (8th Cir. 2002).  In addition, evidence was presented by defendant to show that FOP members who engaged in conduct similar to that of Eitel and Caponetto were similarly disciplined.  On June 30, 2004, the same date that Sergeant Eitel was disciplined, Deputy Richard Musgrave and Sergeant Steve Leone,

---

[32](See Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 35)

both FOP members,[33] received short suspensions for having sexually explicit materials on their Department computers. (See Motion in Limine of Defendant Jackson County to Preclude Evidence of Offensive E-Mails at Ex. B (identified as Plaintiffs' Exs. 39, 40 and 42)) Thus, the evidence suggests that when employees committed similar offenses, they were disciplined similarly, regardless of whether they were FOP members or not. Plaintiffs' disparate treatment argument must fail. The evidence does not support an inference that Eitel and Caponetto were similarly situated to Leaming in all relevant respects, but treated differently.

In arguing that defendant's decision to terminate Leaming is too harsh of a punishment for Leaming's actions, plaintiffs are merely questioning the soundness of defendant's business judgment. As set forth in Evers v. Alliant Techsystems, Inc., 241 F.3d 948, 957 (8th Cir. 2001), the Court is not allowed to sit as a "super-personnel department" and second guess the wisdom of personnel decisions. See also Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.)("The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."), cert. denied, 528 U.S. 818 (1999); Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 472 (8th Cir. 1990)("This court will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives.") The evidence presented to the Court does not support a finding of impermissible motives.

Plaintiffs would have the Court find that Leaming's union activities provide immunity to

---

[33](See Motion in Limine of Defendant Jackson County to Preclude Evidence of Offensive E-Mails at Ex. D (Depo. of Audrey Barber at 201))

other actions that merit discipline. The Court will not do so. See Hughes v. Whitmer, 714 F.2d 1407, 1425 (8th Cir. 1983)("Nor should free speech rights be utilized to provide immunity to other actions that merit condemnation, discipline or sanctions assessed in the public interest."), cert. denied, 465 U.S. 1023 (1984). In light of plaintiffs' failure to adduce any evidence to substantiate a causal link between Leaming's union activities and his termination, defendant's compelling evidence that Leaming would have been terminated in any event and plaintiffs' failure to adduce evidence to substantiate his disparate treatment claim, the Court finds that defendant is entitled to judgment as a matter of law. There is simply no evidence in the record upon which a reasonable jury could conclude that plaintiff Leaming's union activities were a motivating or substantial factor in his termination.

> B.      The FOP's Claim

Plaintiff West Central Missouri Regional Lodge No. 50 of the Fraternal Order of Police alleges that defendant "sought to eliminate Lodge 50 by their actions, including retaliating against members who exercised their right to join and participate in the activities of Lodge 50 and rewarding employees who terminated their involvement with Lodge 50." (Complaint at ¶ 26)

Defendant argues that plaintiff FOP lacks standing to bring any claims in this action, but even if the FOP had standing, the undisputed facts establish that the FOP has not suffered an injury of constitutional proportion. (Suggestions in Support of Defendant Jackson County's Motion for Summary Judgment at 22)

> 1.      Standing

Plaintiff FOP, as the party asserting federal jurisdiction, has the burden of establishing that it has standing. See Dallas Police Ass'n v. City of Dallas, 1999 WL 604850 (N.D. Tex. Aug. 11,

1999). In order for an association to have standing to bring suit on behalf of its members, an association must establish: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553 (1996)(citing Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)). Defendant does not dispute that plaintiff FOP can meet the first two requirements. (Suggestions in Support of Defendant Jackson County's Motion for Summary Judgment at 22) Thus, the issue is whether the claim asserted or the relief requested requires the participation of individual members in the lawsuit.

As set forth in its suggestions in opposition to the motion for summary judgment, plaintiff FOP is seeking the following relief through this lawsuit:

    a.    compensatory damages in the form of lost dues of members who withdrew their membership as a result of the Department's anti-union tactics;

    b.    reasonable attorney's fees spent representing individual members as a result of the Department's anti-union animus; and

    c.    injunctive relief which would prohibit the Department from interfering with the protected First Amendment Rights of all members of the FOP.

(See Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 37) Plaintiff FOP is asserting the following claims against the County:

    a.    anti-union negotiation tactics;

    b.    intimidation of FOP members; and

    c.    disparate treatment in the administration of disciplinary action.

(Id. at 38-44)

Conferring associational standing is improper for claims requiring a fact-intensive-individual inquiry. See Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc., 280 F.3d 278, 286 (3rd Cir.), cert. denied, 537 U.S. 881 (2002). As set forth by the Eighth Circuit Court of Appeals in Terre Du Lac Association, Inc. v. Terre Du Lac, Inc., 772 F.2d 467, 471 (8th Cir. 1985), cert. denied, 475 U.S. 1082 (1986), "[a]ssociational standing is properly denied where ... the need for 'individualized proof' ... so pervades the claims asserted that the furtherance of the members' interests requires individual representation." See also Association for Fairness in Business Inc. v. New Jersey, 82 F.Supp.2d 353, 355 (D.N.J. 2000)("A claim that raises a pure question of law and does not require the presentation of individualized proof of liability or damages is precisely the type of claim that associations ... have standing to pursue.")

In Dallas Police Association v. City of Dallas, 1999 WL 604850 (N.D. Tex. Aug. 11, 1999), the police association brought suit on behalf of its Caucasian and African-American members alleging that promotions were racially discriminatory in favor of Hispanics. The association sought monetary damages[34] as well as injunctive and declaratory relief. With respect to the association's claim for monetary relief, the court found that the association lacked standing to bring the action:

> ... Plaintiff fails to establish that participation of individual members is unnecessary for the [association] to prevail. Here, to prove violations of any member's rights under §§ 1981 and 1983, that member must prove discrimination against him or herself. Moreover, an adjudication of damages necessarily requires specific individualized proof of injuries. As a result, that member's individual participation is necessary to prevail and, hence, the [association] lacks standing under Hunt.

Id. at *3. Like the association in Dallas Police Association, the FOP in this case lacks standing to bring an action for monetary damages. An adjudication of damages in the form of lost dues of

---

[34]The association alleged that it had sustained monetary losses due to the alleged violations. Id. at *1.

33

members who withdrew their membership as a result of the Department's alleged anti-union tactics or attorney's fees spent representing FOP members as a result of the Department's alleged anti-union animus would require individualized proof.

As stated in Committee for Reasonable Regulation of Lake Tahoe v. Tahoe Regional Planning Agency, 365 F.Supp.2d 1146, 1163 (D. Nev. 2005), "seeking equitable [declaratory and injunctive] relief does not per se overcome the prudential prong of associational standing ... [as] associational standing is only proper if neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Participation of individual members would be necessary to prove the violation of any member's rights.

The Court finds that both the relief requested and the claims asserted require the participation of individual FOP members, thus defeating the association's standing to bring suit.

### 2. Alleged Disparate Treatment

Even if the Court were to find that the FOP had standing to bring this action, the FOP's claims would fail.

#### a. Anti-Union Negotiation Tactics

Plaintiff FOP alleges that the sheriff and his representatives demonstrated anti-union animus during negotiations, thus violating the rights of the FOP to exist as an association. (Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 38) The following undisputed facts are relevant with respect to plaintiff FOP's claim that defendant engaged in anti-union negotiation tactics:

1. During negotiations, Mr. Jim Velghe served as chief spokesperson for the Jackson County Sheriff's Department. According to Sergeant Becker, during one of the first negotiation sessions, Mr. Velghe told the FOP negotiators that the "Collective Bargaining Agreement was not a contract, as far as the county

34

was concerned, there was no collective bargaining, there was no binding arbitration, there was no fair share agreement, and Sergeants would not be part of the contract. Those issues were non-negotiable." This position represented a drastic change from the County's previous position during negotiation of the first MOU. (Undisputed Fact #112, supra)

2. Eventually, the sheriff agreed to binding arbitration and included sergeants in the current MOU. In addition, the FOP also obtained an "evergreen clause" in the second MOU, which meant that the terms of the second MOU remained in effect until a new MOU was negotiated. (Undisputed Fact #113, supra)

Based on these facts, plaintiff FOP argues:

... The FOP contends that the County's positions expressed through Mr. Velghe, were designed to bust the union from within, especially with regard to the exclusion of Sergeants from the bargaining unit.

The FOP submits that the Sheriff knew that, if the Sergeants were excluded from the bargaining unit, the FOP membership would be greatly depleted. Also by excluding the Sergeants, the Sheriff would effectively eliminate some of the most vocal members of the FOP. At the time of Mr. Velghe's statement, five of the eight negotiators were Sergeants ... The Sheriff's new hard line position, which would conveniently result in the exclusion of a majority of the FOP leadership from coverage under the contract, suggests that the intent of this position was to effectively eliminate those members which would in turn destroy the foundation of the FOP.

(Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 38-39)

As stated previously, to prove a claim under section 1983, a plaintiff must establish that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right. See Luckes v. County of Hennepin, 415 F.3d 936, 939 (8th Cir. 2005). Contrary to plaintiffs' argument, "hard line" negotiating does not violate the First Amendment.[35] As set forth in Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 465 (1979), "the First Amendment does not

_____

[35]The Court notes that although the sheriff may have taken a "hard line" initially, the sheriff eventually agreed to most of the FOP's demands. (See Undisputed Fact #113, supra)

impose any affirmative obligation on the government ... to recognize the association and bargain with it." Plaintiffs have failed to provide any case law which would suggest that "hard line" negotiating could form the basis for a claim under section 1983. Plaintiff FOP's first claim must fail.

b.     <u>Intimidation of FOP Members</u>

Next, plaintiff FOP alleges that Colonel Kreitler's attempts to dissuade Deputy Kelli Hemstock and Deputy Russell Nicholson from joining the FOP was an attempt to undermine the existence of the FOP and resulted in violations of the FOP's constitutional rights. (Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 39-40) The following undisputed facts are relevant with respect to plaintiff FOP's claim of intimidation of FOP members:

1.     One potential member, Deputy Kelli Hemstock, had to fill out a second FOP membership form because the Sheriff's Department lost her first. When that potential FOP member was filling out her application, Kreitler stood behind her, watched her fill out the paperwork, and commented "It's a never-ending cycle, isn't it Sheri? Three people drop, and one joins, isn't that interesting." He then laughed and exited her office. (Undisputed Fact #118, <u>supra</u>)

2.     After another potential member, Deputy Rusty Nicholson, rejoined the FOP, Kreitler told him that his rejoining the FOP would be a "slap in the face" to the sheriff. (Undisputed Fact #119, <u>supra</u>)

3.     Deputy Nicholson took this to mean that joining the FOP was, in fact, going against the Sheriff. However, on other occasions, Colonel Kreitler told Deputy Nicholson that the FOP was a great organization. When asked if he had the impression that Colonel Kreitler at any time tried to intimidate him or pressure him into not rejoining, Deputy Nicholson responded "No." (Undisputed Fact #120, <u>supra</u>)

Based on these facts, plaintiff FOP argues:

... [t]he fact that Deputy Hemstock and Deputy Nicholson joined the FOP does not in any way diminish the fact that Colonel Kreitler attempted to intimidate them from rejoining in the first place. Simply because Colonel Kreitler's intimidation tactics had no effect, does not excuse them. The FOP contends that

36

these types of intimidation tactics greatly diminished their overall membership. These incidents of intimidation occurred during the heated exchanges between the Sheriff and the FOP regarding the expired contract. The FOP submits that the Sheriff and Col. Kreitler's intent was to undermine the FOP leadership by intimidating members allying themselves with management. Thus undercutting the position of the FOP and greatly diminishing its ability to unify its membership. The FOP submits that this evidence demonstrates the Sheriff's anti-union animus and so creates a genuine issue of material fact as to the Sheriff's motivations in attempting to intimidate members.

(Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 40)

Plaintiff FOP has provided absolutely no evidence to suggest that its membership was diminished in any way by any actions of defendant. Plaintiff relies merely on innuendo and conclusory allegations for its claim. As stated previously, innuendo and conclusory allegations will not defeat a motion for summary judgment. See Green v. St. Louis Hous. Auth., 911 F.2d 65, 70 (8th Cir. 1990). See also Putman v. Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003)("To survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.") Plaintiff FOP's second claim must fail.

      c.     Disparate Treatment in the Administration of Disciplinary Action

Finally, plaintiff FOP alleges that the sheriff's administration of discipline had a disparate impact on FOP members. Plaintiff FOP lists three incidents in support of its position:

1.     Discharge of Deputy Hughes for allegedly pointing his gun at another deputy;

2.     Promotion of Sergeant Newberry after resignation from the FOP;[36] and

_____

[36]The FOP does not actually allege disparate treatment in the administration of disciplinary action through this incident. Instead, the FOP alleges disparate treatment in the administration of opportunities for advancement.

37

3. Discharge of Deputy Laframboise after referring to the sheriff as a "bastard" and a "liar" on a public website.

The Court will examine each of these incidents.

First, the following undisputed facts are relevant with respect to plaintiff FOP's claim of disparate treatment in the discharge of Deputy Hughes:

1. The FOP claims that in May 2003, Sergeant Newberry, who was not a member of the FOP, pointed his firearm at another officer, but was not punished for this act, whereas in 2001 when another officer, Deputy Hughes, who was an FOP member, pointed his firearm at an officer, he was terminated. (Undisputed Fact #128, supra)

2. An investigation into the Hughes incident revealed that Deputy Hughes had drawn his weapon and pointed it at the other officer in anger over something the officer had said. Hughes received a Notice of Pre-Termination Hearing. Before the hearing took place, Deputy Hughes requested to resign and the sheriff permitted him to do so without holding the pre-termination hearing. (Undisputed Fact #129, supra)

3. An investigation into the Newberry incident revealed that Newberry had been discussing the Hughes incident with other officers in a joking manner when he drew his weapon and pointed it in the direction of another officer, mimicking Hughes' conduct. The investigation revealed that Newberry did not do so in a threatening manner. As a result, Sergeant Newberry received a written reprimand and an extension of his probationary period as a sergeant. (Undisputed Fact #130, supra)

Based on these facts, plaintiff FOP argues:

... The FOP suggests that Sergeant Newberry was given more lenient discipline than Deputy Hughes, because Sergeant Newberry was not a member of the FOP. The FOP suggests that this incident demonstrates that FOP members received more harsh discipline than non-members as a result of their affiliation with the FOP. Defendant in its brief claims that the two incidents are "markedly different in degree," claiming that pointing a gun at someone in jest is somehow less dangerous than pointing a gun at someone in anger. Pointing a gun at someone is dangerous, regardless of the circumstances. Both incidents could have resulted in the serious injury or death of a fellow deputy, and as the Defendant admits, both showed serious poor judgment, especially considering that Newberry was a sergeant and a supervisor. Despite this, the Department was lenient in its assessment of discipline against Newberry. The FOP suggests that Sheriff in this situation was trying to send

38

a clear message to the membership–"Leave the FOP and I will take care of you."

(Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 41)

Plaintiffs have failed to establish that Sergeant Newberry and Deputy Hughes were similarly situated. As stated previously, "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994). Plaintiffs acknowledge that Hughes pointed his gun at another deputy in anger, while Newberry did so in jest. As defendant points out, it is far more serious when a firearm is pointed at another in anger, rather than in jest, because anger signifies a loss of emotional control that can lead to unpredictable conduct. The sheriff had a reasonable basis for treating the offenses differently. There is no indication that membership in the FOP played a part in the sheriff's decisions relating to Hughes or Newberry. Plaintiff FOP's claim must fail.

Second, the following undisputed facts are relevant with respect to plaintiff FOP's claim of preferential treatment in the promotion of Sergeant Newberry:

1. The FOP maintains, as part of its cause of action, that a deputy was promoted after he left the FOP. (Undisputed Fact #121, supra)

2. According to Becker, then Deputy Newberry quit the FOP in December 2002. (Undisputed Fact #122, supra)

3. In March 2003, Newberry was promoted from deputy to sergeant. (Undisputed Fact #123, supra)

4. Under the previous MOU, which had expired, promotions were to be from the top five candidates on the promotion list. Although he did not have to follow the expired MOU at that time, the sheriff selected Newberry for promotion from deputy to sergeant. Newberry was one of the top five candidates on the eligibility list. (Undisputed Fact #124, supra)

Based on these facts, plaintiff FOP argues:

... At the time of the promotion, Newberry was fifth on the promotion list.

39

The Sheriff suspiciously skipped the other four candidates who were presumably more qualified, given their placement on the list, and promoted Sergeant Newberry within a few months of his resignation form the FOP. The timing of this promotion strongly suggests that Sergeant Newberry's promotion was a reward for withdrawing from the FOP.

Finally, Defendant also claims that the Sheriff followed the provisions of the MOU in promoting Sergeant Newberry, and that somehow cures the Sheriff's apparent improper motives in skipping the four other candidates. The fact remains that the Sheriff skipped four qualified individuals and he has not offered proof to demonstrate a legitimate reason for doing so.

(Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 42)

Defendant points out that plaintiff FOP fails to present any evidence that Newberry was not qualified for promotion, that other candidates were more qualified, or that other candidates were FOP members. (Reply Suggestions in Support of Defendant Jackson County's Motion for Summary Judgment at 30) Instead, plaintiff FOP relies on speculation. As stated previously, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." Putman v. Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003). Plaintiff FOP's claim must fail.

Finally, the following undisputed facts are relevant with respect to plaintiff FOP's claim of disparate treatment in the discharge of Deputy Laframboise:

1. The FOP asserts that Sheriff Phillips discharged Deputy LaFramboise because he was an FOP member who "exercised his freedom of speech and voiced his opinion on a public Web site." (Undisputed Fact #125, supra)

2. LaFramboise was a deputy sheriff for the Jackson County Sheriff's Department from September 2001 until August 2004, where his employment was terminated for insubordination. (Undisputed Fact #126, supra)

3. Prior to his termination, LaFramboise posted writings on the website referring to Sheriff Phillips as a "bastard" and a "liar." (Undisputed Fact

#127, supra)

4.    The FOP alleges that the sheriff failed to investigate an anonymous e-mail that made disparaging remarks about the FOP.  The e-mail states that it was sent by "William Wallace."  No one seems to know a William Wallace, and that name appears to be the name of a movie character.  (Undisputed Fact #132, supra)

5.    There is no evidence that Sheriff Phillips, Colonel Kreitler, or the command staff sent the e-mail, directed someone to send the e-mail, condoned it or even knew about it until it was brought to their attention.  (Undisputed Fact #133, supra)

6.    Sheriff Phillips did not order an investigation regarding that particular e-mail. (Undisputed Fact #134, supra)

7.    The FOP claims that the sheriff allowed an employee to post a picture of the Three Stooges with the caption "FOP Board" (or words to that effect) in a cubicle in the department office.  (Undisputed Fact #135, supra)

8.    The Three Stooges picture was removed after an employee complained about it.  (Undisputed Fact #136, supra)

Based on these facts, plaintiff FOP argues:

      In another display of disparate treatment, a member of the FOP was terminated for allegedly making disparaging remarks about the Sheriff on a [public] website, while other Deputies were permitted to post inflammatory pictures on Department bulletin boards, disparaging the FOP without repercussions. ... [T]he [Laframboise] incident is telling in regard to the manner in which the Sheriff chose to investigate this alleged improper incident and overlook others.  Not unlike the statements made by Deputy Laframboise, Defendant admits that someone within the Department was allowed to post a picture of the Three Stooges in police uniforms on a Department bulletin board with a caption making negative reference to the FOP and its leadership. ... In the case of the Three Stooges picture, no investigation was initiated to determine who had posted the picture and no discipline was ever issued. ... Again, when a Deputy who was an FOP member disparaged th Sheriff, it was quickly investigated and the Deputy was terminated.  On the other hand, when a member of the Department posted a poster disparaging the FOP, nothing was done.

      In addition to the Three Stooges picture, another member of the Department circulated what the Defendant's reference as the William Wallace memo. ... In the memo, the unidentified author refers to the FOP leadership as maggots on a pile of shit.  Defendant correctly notes that the author was never identified, the reason

41

being–the Sheriff never attempted to investigate or identify the author. Again, when members of the Department disparaged the Sheriff, an investigation was launched and they were quickly terminated. However, when employees disparaged members of the FOP who were also members of the Department, no discipline was issued and no investigation was conducted. This evidence again demonstrates that employees who supported the FOP were treated differently than those who allied themselves with the Sheriff. The evidence further demonstrates the Department's overall disparate treatment of FOP members and its chilling effect on the FOP to operate as an association. This Department's anti-union animus detrimentally affect the FOP's membership and was intended to destroy the Union at its base.

(Plaintiffs' Suggestions in Opposition to Defendant's Motion for Summary Judgment at 42-44)

Plaintiff FOP does not argue that Deputy Laframboise had a First Amendment right to call the sheriff a "bastard" and a "liar" on a public website, nor that Laframboise's discharge was inappropriate. Instead, plaintiff argues that if Laframboise was disciplined for statements made against the sheriff, those responsible for the Three Stooges picture and the William Wallace memo should have been disciplined for statements made against the FOP. As stated previously, to prove a claim under section 1983, a plaintiff must establish that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right. See Luckes v. County of Hennepin, 415 F.3d 936, 939 (8th Cir. 2005). There is no evidence that Sheriff Phillips, Colonel Kreitler, or the command staff sent the William Wallace e-mail, directed someone to send the e-mail, condoned it or even knew about it until it was brought to their attention. When someone complained about the Three Stooges picture, it was removed from the board. The fact that the sheriff did not order an investigation into who posted the Three Stooges picture or sent the William Wallace memo does not infringe on the FOP's First Amendment right of association. Again, other than its assertion that the Department's anti-union animus detrimentally affected the FOP's membership, plaintiff FOP has provided absolutely no evidence to suggest in what way its membership was detrimentally affected by any actions of defendant. Plaintiff relies merely on innuendo and conclusory allegations. As

42

stated previously, innuendo and conclusory allegations will not defeat a motion for summary judgment. The Court will not second-guess the manner in which the sheriff chooses to exercise his discretion over the use of department resources. There is no indication that an improper motive played a part in the sheriff's decisions. Plaintiff FOP's final claim must fail.

IV. <u>CONCLUSION</u>

Based on the foregoing, it is

ORDERED that defendant's Motion for Summary Judgment (doc #119) is granted.

_____<i>/s/ Sarah W. Hays</i>_____<br>
SARAH W. HAYS<br>
UNITED STATES MAGISTRATE JUDGE